LOUISVILLE, NASHVILLE & GREAT SOUTHERN RAIL
ROAD COMPANY *v.* SIMON FLEMING.

1. DAMAGES. *Negligence.* The rule in this State in the case of contrib-
utory negligence is that if the injured party proximately contribute
to the injury, he cannot recover damages, nor can he recover if
both parties are equally in fault, but he may recover if the negli-
gence of the other party was the proximate cause of the injury, al-
though he may have contributed to the injury by his own negli-
gence, such negligence going only in mitigation of the damages.

2. SAME. *Same.* The negligence or wrongful conduct of the injured
party may be considered in mitigation of damages, whether the
damages recoverable be only compensation, or compensatory, and ex-
emplary.

3. SAME. *Same. Railroad.* The rule is applicable to all cases of con-
tributory negligence, and is not confined to cases growing out of our
statutes regulating the duties of railroad employes on a moving
train when an obstruction appears on the track.

Railroad Company *v.* Fleming.

4. RAILROAD. *Purchaser of ticket.* A person who purchases a ticket, which entitles him to be carried as a passenger on a railroad train, takes it subject to such reasonable rules and regulations as the railroad company may have prescribed, and regulations would be reasonable which provided that the passenger should, on demand, exhibit his ticket on entering the train, and should afterwards, on like demand, surrender his ticket or pay the fare under the penalty, in case of failure, of removal from the cars.

5. SAME. *Regulation.* The reasonableness of a rule or regulation of a railroad corporation is a question for the determination of the court, not of the jury.

6. SAME. *Lost ticket.* There is no distinction, so far as it affects the relative rights of the parties, whether a ticket be lost or mislaid before or after going on the train.

7. SAME. *Same.* The exhibition of his ticket by the passenger to the employe in attendance for the purpose, upon entering on the train, will give the passenger no other or different rights than if he had not exhibited it.

8. SAME. *Same.* A passenger who loses or mislays his ticket after entering the cars, has no right to supply its place by offering testimony that he actually bought the ticket, and lost it, and the conductor or other employe, whose duty it is to take up the ticket, cannot be required to hear testimony on the subject, or to determine its weight at the peril of the company, under a rule which gives him no discretion.

9. SAME. *Passengers.* Persons laboring under physical infirmities, or otherwise unable to take care of themselves, who travel on railroad trains, must provide proper assistance for themselves, and it is not the duty of the conductor, in the absence of instructions from the company, to render such assistance.

10. SAME. *Same.* *Ticket.* The conductor of a railroad train cannot be required to search the pockets of a passenger for his ticket, and, of course, if he consents to search a particular pocket at the request of the passenger, he is not bound to search further, it being the duty of the passenger to produce and deliver his own ticket on demand.

11. SAME. *Same.* *Negligence.* If, however, the conductor does, at the request of a passenger, undertake to search for the passenger's ticket, he should do so properly and in good faith, but only to the extent of the request, and if, acting in good faith and with ordinary diligence, he fail to find the ticket, neither he nor the company would

Railroad Company *v.* Fleming.

be liable for the consequences of the failure; nor would they be liable if the passenger were guilty of equal or greater negligence.

12. SAME. *Ticket. Damages.* If the conductor, after yielding to the request of the passenger to search for his ticket in a particular pocket, merely pretended to do so, or performed the act in so grossly negligent a manner as to indicate a wanton and wicked purpose to disregard the rights of the passenger, or to wilfully inflict on him an injury, the company would be liable in exemplary damages, the negligence of the passenger going only in mitigation of the recovery; in every other contingency, if the company be liable at all, being itself free from fault, the damages would only be compensatory.

13. SAME. *Damages.* Where a passenger has been removed from a railroad train wrongfully, the company would be liable for the ordinary and natural results of the act, and therefore such as might have been reasonably expected, in view of the duty of the passenger to exercise ordinary care to so act afterwards as to prevent injury.

14. SAME. *Same.* The plaintiff in this case, an old colored man whose hands were partially paralyzed, had taken passage on the defendant's train from Franklin to Nashville, and for failing to produce his ticket or pay his fare on demand, was, about 8 o'clock at night, put off at a station nine miles from Nashville, where there were a depot building and thirty or forty houses, many of them occupied by persons of his own race and color, and thereupon, although the night was cold, with snow on the ground, and snowing and sleeting, undertook to walk to Nashville, and did so. It was held that the injuries caused by the walk, if any, would not be the proximate result of the removal from the cars, unless, after reasonable effort at the station, he failed to find shelter or conveyance, nor then, if, in the opinion of the jury, his failure was due to his negligence in not having with him money to pay for the accommodations demanded, rather than a proximate result of the removal.

FROM WILLIAMSON.

Appeal in error from the Circuit Court of Williamson county.   J. G. WALLACE, Sp. J.

ED. BAXTER, SMITH & ALLISON and JNO. H. HENDERSON for Railroad.

WM. HOUSE, BATE & WILLIAMS and H. H. COOK for Fleming.

COOPER, J., delivered the opinion of the court.

This is an action brought by Fleming against the railroad company to recover damages for an alleged wrongful ejection from the company's train of cars while traveling from the town of Franklin to the city of Nashville. The verdict and judgment below were in favor of Fleming, and the company appealed in error. The Referees have reported that the judgment should be reversed for an error in the charge of the trial judge to the jury. Both parties have filed exceptions, which open the whole case.

Fleming is a colored man, eighty three years of age at the time of the occurrence, whose hands were partially paralyzed and numb so that he could not readily grasp any little thing, nor even feel it when between his fingers. He lived in Williamson county with his son, William Fleming, and had two daughters who resided in the State of Kansas. One of these daughters was on a visit to him, and he intended to return with her to Kansas. On January 2, 1879, this daughter took the plaintiff's clothes and money and went from Franklin to Nashville on an express wagon to purchase through tickets to Kansas for her father and herself. He was to follow on the night train of the railroad company, and meet her at the Louisville depot at Nashville. The plaintiff's son, William, took him to the depot of the company at Franklin, and bought a ticket for him to Nashville,

which he put into the left hand pocket of his father's vest, telling him that the conductor on the train would call for it, and to let him have it.   The son assisted his father to get on the train, telling the brakesman of the company, whose duty it was to see that those persons who entered the train had tickets, that his father had a ticket in his pocket.   He placed his father in a seat, and gave him the instruction mentioned, that the conductor would call for his ticket before the cars had gone very far, and when he did to give it up to him.   He then stepped back toward the door, and meeting the brakesman, pointed out his father to him, saying that he was old, feeble, and partially paralyzed, and was going to meet his daughter at the Louisville depot at Nashville; that he did not know one depot from another, and requesting the employe to see that he got off at the Louisville depot. The employe replied "all right."   Before the cars had gone far the conductor did call upon the plaintiff for his ticket, he says, and began to hunt for his ticket, and could not find it.   He told the conductor his hands were paralyzed, and asked him to put his hand in his left vest pocket, designating the pocket by placing his own hand on it, and get it out for him.   The conductor did put his fingers in the pocket, "flipped them along, just brushed them through like," says the plaintiff, and told him he had no ticket. The plaintiff then said that his son had bought him a ticket, and put it in his vest pocket.   There were several colored persons in the car, who had got on the train at Franklin, and knew the plaintiff well.

Two or three of these passengers spoke up, and said that they knew the plaintiff's son had bought a ticket as the plaintiff claimed, and put it in his father's pocket. The conductor testifies that he examined the pocket carefully and found no ticket, and then, with the aid of his lantern, searched the seat and the floor to see if the ticket had been dropped. The other testimony is in conflict as to this search. The conductor told the plaintiff that if he did not find the ticket by the time he came back, or pay him the fare from Franklin to Nashville, ninety-five cents, he would put him off at the next station. The plaintiff told the conductor that his daughter had his money at Nashville, and offered to pay him when he got to the depot where he expected to meet her. He also tried to borrow the money from his fellow passengers. A white passenger then told him that if he had paid for his ticket he could not be put off the cars. This quieted the plaintiff, and he did nothing further. He did not even request any of his fellow townsmen to examine his pocket in search for the ticket. The conductor, after going through the train taking up the tickets, returned to the plaintiff, who was unable to produce a ticket or the money. The conductor then instructed the brakesman to put the plaintiff off at the next station, which he did, the plaintiff offering no resistance, but going off quietly. He, himself, testifies that the conductor and brakesman did not speak to him harshly, and that he was not roughly handled when put off the train.

The plaintiff was put off at Brentwood, a station

half way between Franklin and Nashville, being about nine miles from each place. It is a small town of thirty or forty houses,, many of them occupied by colored persons, with a depot house near the road. It contained no public house or livery stable. He was put off about 8 o'clock at night. It was a very cold night, with snow on the ground, and sleeting or snowing at intervals. The plaintiff made no effort to obtain shelter for the night at Brentwood, either from the depot agent or any of the citizens. By the persuasion of another negro, who also got off the cars at Brentwood because he had no money to pay his fare any further, the plaintiff was induced to go with him on foot to Nashville at once. They reached Nashville between eleven and twelve o'clock at night, the plaintiff suffering much from the cold and the exertion. On the next morning, the plaintiff's daughter either found the ticket in the father's left vest pocket, as he testifies, or in some other part of his clothing. She says: "I put my hand in his pocket and the first thing I felt was the ticket." They went to the office of the company, and upon presenting the ticket were paid fifty cents for it. The plaintiff went on that day to Kansas, where he remained several months before returning home. There is testimony tending to show that the plaintiff had hernia on one side before the occurrence, and has since been afflicted with hernia on both sides, and with hydrocele.

The trial judge, from the burden of his charge, was of opinion that the jury might find that the plaintiff was entitled to exemplary as well as compen-

satory damages.  And in view of the settled law of this State he charged that if the defendant was guilty of a wrong, by which the plaintiff was injured, and plaintiff was also in some degree negligent, or contributed to the injury, it should go in mitigation of damages.  He then added: "But the doctrine of contributive negligence has no application to an action for an intentional tort of willful neglect, or actual wrongful act of the defendant.  If it were a reckless or wanton act of the carrier in expelling the plaintiff from the train, the carrier can claim no protection from contributory negligence even in mitigation of damages."  This was the part of the charge which the Referees have reported to be erroneous.

The intrinsic difficulty of the subject of contributory negligence has led to three distinct lines of decisions.  In England and a majority of the States of the Union, the negligence of the plaintiff which contributes to the injury is held to be an absolute bar to the action.  In the States of Illinois and Georgia the doctrine of comparative negligence has been adopted, that is, if on comparing the negligence of the plaintiff with that of the defendant, the former is found to be slight and the latter gross, the plaintiff may recover.  In this State we hold that although the injured party may contribute to the injury by his own carelessness or wrongful conduct, yet if the act or negligence of the party inflicting the injury was the proximate cause of the injury, the latter will be liable in damages, the negligence or wrongful conduct of the party injured being taken into consideration, by

way of mitigation, in estimating the damages. In other words, if defendant was guilty of a wrong by which plaintiff is. injured, and plaintiff was also in some degree negligent or contributed to the injury, it should go in mitigation of damages, but cannot justify or excuse the wrong: *East Tennessee, Virginia & Georgia Railroad Company v. Fain,* 12 Lea, 35. At the same time we hold that if a party by. his own gross negligence bring an injury upon himself, or proximately contribute to such injury, he cannot recover; neither can he recover in cases of mutual negligence where both parties are equally blamable: *Id.* The principal difference between our rule and the English rule, as modified · by the more recent decisions, is in allowing the damages to be mitigated by the conduct of the injured party. In this respect our rule meets the objection which Mr. Thompson, in his notes on contributory negligence, makes to the construction put by some of the courts on the English rule, or to the application of the rule in particular cases. "It is," he says, "nothing more than a declaration that although both parties have been guilty of negligence contributing to the injury, the party who suffered the damage is to be completely exonerated, and the other party is not to be exonerated to any extent; the former is to recover of the latter without any abatement on account of his own share of the fault, all the damages which he has suffered. This is, he adds, "manifest injustice; and yet it is practiced every day in the courts of England and in those of nearly every State in the Union": 2 Thomp. on Neg., 1155. Our

Railroad Company v. Fleming.

rule, moreover, is merely an adaptation of the law which prevails in civil actions for assault and battery, where the conduct of the plaintiff in the way of provocation is always admissible in evidence to mitigate the damages: *Jackaway* v. *Dula,* 7 Yer., 82; *Chambers* v. *Porter,* 5 Cold., 273, 280: Suth. on Dam., 745.

It is obvious, however, that in States which have adopted a different rule from ours in relation to the effect of contributory negligence, the decisions of their courts must be received with caution upon the question of damages. In New York and other States, where the English rule prevails, the plaintiff is entitled to compensatory damages without reference to his own conduct, but it has been intimated that if the plaintiff claims exemplary damages in a case which warrants the claim, his language and conduct may be shown in mitigation of the recovery: *Vedder* v. *Fellows,* 20 N. Y., 126. A like intimation is made in *Matthews* v. *Warner,* 29 Gratt., 570. And the courts of those States all hold that the defendant will be liable whenever his conduct has been such as to justify the finding of exemplary damages, that is, where it has been reckless and wanton, although the plaintiff was a trespasser, and did not use ordinary care to avoid the injury, or otherwise acted wrongfully: Cooley on Torts, 674; *Sanford* v. *Railroad Company,* 23 N. Y., 346; *Mulherrin* v. *Railroad Company,* 81 Penn. St., 368; *Railroad Company* v. *Adams,* 26 Ind., 78.

Our decisions are that the plaintiff's negligence or wrongful conduct may be considered in the mitigation

of damages, whether the damages recoverable be compensatory only, or compensatory and exemplary, that is to say, whether the defendant's conduct has been merely negligent or reckless and wanton. The question came first before the court in cases growing out of our statutory regulations in regard to what precautions should be taken by the employes of a running railroad train when a man was on the track, and it was laid down generally that the jury might look to the negligence of the injured party in mitigation of damages. Some of these were cases of compensatory and others of exemplary damages: *Railroad Company* v. *Carroll,* 6 Heis., 347; *Railroad Company* v. *Smith,* 6 Heis., 174; *Railroad Company* v. *Burke,* 6. Cold., 45; *Railroad Company* v. *Nowlin,* 1 Lea, 523. Even in those States in which the conduct of the plaintiff is not allowed to be looked to in mitigation of compensatory damages, the rule is otherwise as to exemplary damages. Of course, there could not have been any doubt that the latter rule would prevail in like cases in this State. The only doubt could have been as to the mitigation of compensatory damages. The question was directly raised and decided in *Railroad Company v. Conner,* 2 Baxt., 382. In that case, after charging the jury that they might look to the conduct of the company's agents to see whether there were circumstances of aggravation with the view of assessing exemplary damages, the trial judge said: "And when considering this question of exemplary damages, it would be proper for the jury to take into consideration the condition of the deceased at the time

of the accident, and as to how far his condition and conduct, his carelessness, recklessness and imprudence contributed to the result. But remember you are not to consider these facts in fixing the liability of the company, or in assessing the direct pecuniary damages resulting to the party from the injury sustained, for as to them the statute makes the company fully liable, when liable at all." In other words, his Honor charged that the jury might look to the conduct and negligence of the plaintiff in mitigation of exemplary damages, but not of compensatory damages. The correctness of the charge, so far as the exemplary damages were concerned, was taken for granted by the counsel and the court, the contest being on the clause relating to compensatory damages. This court said: "This charge, so far as it holds that the condition and conduct, recklessness and imprudence of the deceased are not to be considered by the jury in assessing the direct pecuniary damages resulting to the party from the injury, was erroneous." The negligence and conduct of the plaintiff will go, therefore, in mitigation of compensatory damages, and *à fortiori*, of exemplary damages in these railroad cases under the statute.

But, as has been well said by Judge Freeman, the statute in its requirements embodies no more than the common law, and every other enlightened system of jurisprudence, demands of its citizens. The statute has only shifted the burden of proof. "It never was the law that any citizen would not be responsible if he saw another on his track, even a trespasser, and rode over him when he could have avoided it." *Rail-*

*road* v. *Humphreys*, 12 Lea, 200, 206. The same
principles would, therefore, be applicable in other cases
of contributory negligence not within the statute. And
so it was expressly held where the injured party fell
through the hatchway of a store into which she had
accompanied her mother, who went in the store for
the purpose of buying an article sold therein: *Bush*
v. *Fitzhugh*, 2 Lea, 307. And so in a civil action
against an individual for damages for the killing the
plaintiff's intestate by shooting, this court said that
the illegal conduct of the deceased at the time of the
killing tending to provoke the defendant to shoot,
might be looked to by the jury in assessing the dam-
ages: *Marks* v. *Borum*, 1 Baxt., 87. And there is
no reason why the same rule will not apply to any
case of contributory negligence, where the plaintiff's
conduct or negligence has been such as to charge him
with some blame in the matter of the injury com-
plained of. In this view the charge of the trial
judge upon the point under consideration was erroneous.

The trial judge, after stating that the railroad com-
pany was authorized to charge and receive compensa-
tion for the carrying of passengers, and to prescribe
and enforce reasonable rules and regulations for the
government of those passengers under the contract of
carriage, proceeded thus: " If the plaintiff purchased
a ticket from the defendant's office at Franklin to
Nashville that entitled him to admittance into the cars,
and to be carried safely from the one point to the
other, and the company had a rule requiring persons
before entering the train to exhibit their ticket, or to

afford other satisfactory evidence to the officer entrusted with the duty that they had a ticket, it would be the duty of the passenger to comply with the regulation, this being a reasonable and proper rule. When the passenger has complied with this requirement, he then becomes entitled to the right to ride on the train to the place for which his ticket calls. The purchase of, and payment for a ticket, constituted a contract which the passenger has the right to have executed by the company under such legal and reasonable rules and regulations for his conduct on the train as the company may have prescribed. It would be a reasonable regulation to demand of passengers the exhibition and surrender of their tickets, and a passenger willfully refusing to comply with reasonable regulations of this character forfeits his right to further carriage. But if the passenger purchased a ticket, and the conductor knew or had satisfactory evidence that he had accidentally lost it, he has no right to expel him from the train. It is not the ticket alone that entitles him to be carried, but the contract he has made and the payment of his money. The ticket is only an evidence of the contract and of his right under the contract. If the passenger has actually purchased a ticket, and by accident after he has entered the train loses it, he will not by that alone be deprived of his rights acquired under the contract. In that case it will devolve on the passenger to produce reasonable and proper evidence of the fact that he purchased and lost his ticket. The evidence required in such case would be just

such testimony as would be sufficient to satisfy a reasonable man of any other fact. Therefore, if the plaintiff purchased a ticket to Nashville, and on the faith of it was admitted on the train, (whether, as his Honor elsewhere says, actually shown or only offered to be shown), and afterwards lost or misplaced it, so that it could not at the time be found, it was his duty to show to the conductor, by such evidence as I have mentioned, these facts. Upon doing so he would be entitled to the rights he acquired by the purchase of his ticket and its possession. And if, after the production of such testimony the conductor or officer demanding the ticket refuses to accept it, and expels the passenger, he does it at his peril, and the company would be liable in damages for the act of its agent or officer. * * * If, therefore, you are satisfied from the evidence that the plaintiff purchased a ticket at Franklin to go to Nashville, and when being placed on the train the officer at the door admitted him upon such evidence as he was then willing to accept of that fact, the plaintiff then became a passenger, and was entitled to be carried safely to his destination. If, then, when another officer came around demanding tickets, the plaintiff could not find his, and he offered to produce, and did produce proper and legal evidence of the fact that he had purchased a ticket, the carrier would have no right to eject him for two reasons: First, the officer receiving him into the train, and who was charged with the duty of ascertaining in advance that persons entering had tickets, knew the fact, and knowledge on the part of

the agent is knowledge on the part of the principal, the company then would know that he had a ticket, and no other agent would have a right to disregard that knowledge; and secondly, the second officer would have no right to disregard evidence that would be sufficient to satisfy a reasonable mind of any other fact. In such case the act would be wrongful, and the defendant responsible."

When we come to analyze this charge we find that it contains several distinct propositions, some clearly expressed and others necessarily to be inferred, in order to come to the conclusion reached. They may be condensed thus:

First, Lying at the foundation of the charge, although not stated in so many words, is the idea that there is a distinction between the loss or mislaying of a ticket before and after going upon the train, so that it cannot be produced when lawfully demanded by the conductor under a rule or regulation of the company which they are authorized to make.

Second, The purchase of a ticket constitutes a contract which the passenger has a right to have executed by the company under such reasonable rules and regulations as the company may have prescribed, and it would be a reasonable regulation to demand of passengers before entering the train to exhibit their tickets, and afterwards the exhibition and surrender of their tickets.

Third, But if the officer of the company at the door of the train admit a passenger " upon such evidence as he was then willing to accept," that

the passenger had a ticket, then the knowledge of that officer of the passenger having a ticket would be knowledge of the company, and the conductor, whose duty it was to subsequently take up the ticket, could not disregard that knowledge.

Fourth, And if the passenger who has purchased a ticket by accident loses it after he has entered on the train, he may supply its place by producing such testimony that he purchased and lost his ticket as would be sufficient to satisfy a reasonable man of any other fact.

Fifth, It is a necessary inference from the foregoing propositions that if the rule of the company requires the conductor to put the passenger off unless he produces a ticket or pays the fare, the conductor must not obey the rule, but must hear the testimony offered by the passenger that he had purchased and lost his ticket, and at his peril and the peril of the company, determine whether it is such as "would be sufficient to satisfy a reasonable man of any other fact." Obedience to the rule of the company is not made to depend on the reasonableness of the rule, but upon the exercise of the judgment of the conductor on such evidence as the passenger may see proper to produce.

We are afraid that not one of these propositions, except the second, which only embodies the general right of the holder of a ticket subject to the rules and regulations of the company, can stand the test of either reason or authority.

His Honor, the trial judge, correctly conceded the

right of the company to make reasonable rules and regulations touching the exhibition and surrender of their tickets by passengers, all the authorities concur- ring as to the existence of the power, and that such rules and regulations became a part of the contract between the company and the purchaser of one of its tickets : *Trotlinger* v. *Railroad Company*, 11 Lea, 533.   It was shown in proof in this case that the company did have a rule requiring brakesmen to be posted at the door of the cars to see' that passengers exhibited their tickets before entering, and another rule thus worded : " Passenger conductors are allowed no discretion, but are required to collect a ticket, pass or cash fare from each and every person who rides upon their train, except ' certain officers of the company.' "   By another rule the conductor is author- ized to request passengers to leave the train " if the nature of the case justifies it," at the first station, and to use the least force necessary to expel the pas- senger.

The rules and regulations of a railroad corpora- tion, as of other corporations, are subject to the re- quirements that they must be reasonable.   Whether they are reasonable or not is a question for the court and not for the jury, and this for the obvious reason that there must be uniformity in the construction, which can always be obtained by the decision of this court.   If left as a question of fact to the jury, the result might vary with each jury, and the corporation could have no certainty that any rule would stand the test with every jury.   Ordinarily, too, jurors are

10—VOL. 14.

not aware, and cannot readily be made aware, of all the reasons calling for the rule: *Vedder* v. *Fellows*, 20 N. Y., 126.

His Honor, the trial judge, although he indulges in some severe comments on unreasonable regulations, does not say in so many words that the rules in question are unreasonable. His idea seems rather to be that no matter how positive the language of the rule is, it must be considered as subject to the qualification that in particular cases their enforcement must be left to the discretion of the conductor at the peril of the company. But if the element of discretion is once introduced, there is no longer any rule, whether it be the unlimited discretion of the conductor or a discretion to be subject, according to his Honor's views, to the subsequent revision of a jury. The Referees, or rather a majority of them, the other Referee dissenting, take the same view as the circuit judge. They concede that a railroad company may lawfully eject a traveler from their cars for the non-production of a ticket, and that such a rule is reasonable, and perhaps beneficial to the company and the traveling public, but think there should be some exception to it, and that the case made in the record is a proper exception. But they do not undertake to say how such exceptions can be grafted on the rule without in effect abolishing the rule by making it depend on the discretion of the conductor, which in that event ought to be final, or on the verdict of a jury in each particular case. Rules requiring passengers to produce their tickets, or surrender them

when demanded by the conductor, and authorizing the passenger to be ejected from the cars on his failure so to do, have been repeatedly sustained by the courts: *Hibbard* v. *Railroad Company*, 15 N. Y., 455; *Jerome* v. *Smith*, 48 Vt., 230; *Frederick* v. *Railroad Company*, 37 Mich., 342; *Townsend* v. *Railroad Company*, 56 N. Y., 295. No authority has been produced to the contrary. The case of *Pullman Car Company* v. *Reed*, 75 Ill., 125, is altogether different. There the passenger had purchased a ticket for a sleeping berth in the company's car which was assigned to him, but having lost the ticket before the train started, he procured from the ticket agent a certificate, directed to the conductor, that he had paid for the particular berth, designating it. It was held that he was wrongfully ejected, because the berth being designated and assigned, it was reasonably certain that the company could not be defrauded by the lost ticket falling into the hands of another person who might claim that berth. No such protection exists in the case of a passenger ticket for carriage. In *Hibbard's* case above, the conductor had previously called for and seen the plaintiff's ticket, and a fellow passenger assured the conductor that the plaintiff's fare was paid, and that he had a ticket, yet the ejection of the passenger for his refusal to show his ticket was held to be lawful. In *Jerome* v. *Smith ut supra*, the loss was of a check given for one coupon of a ticket taken up by a former conductor, the ticket showing the passenger's starting point, yet it was held the passenger was not entitled to any recovery. The other *New York* case was when

the conductor had taken the passenger's ticket with-out giving any check, and a subsequent conductor had ejected the passenger for refusing to pay fare. In the *Michigan* case, the ticket agent had given the pas-senger a ticket for a point short of that to which the passenger had paid, and, upon his refusal to pay the additional fare not covered by the actual ticket, it was held that he was properly ejected. The court comment upon the impracticability of going into an investigation in such a case of outside facts, and say: "There is but one rule which can safely be tolerated with any decent regard to the rights of railroad com-panies and passengers generally. As between the con-ductor and passenger, and the right of the latter to travel, the ticket produced must be conclusive evi-dence, and he must produce it when called upon as evidence of his right to the seat he claims."

It is obvious, from the very nature of things, that there can be no distinction in the rights of a pas-senger whether he loses or mislays his ticket before getting on the train or afterwards. The risk of the company is precisely the same in either event. And the knowledge of the officer who sees the ticket at the door of the car can have no more effect in the one case than the knowledge of the ticket agent who sells the ticket to the particular passenger can have in the other. The knowledge of the latter official would be as much the knowledge of the company as the knowledge of the former. And the conductor cannot be required by the production of testimony to make an exception to a rule which gives him no dis-

cretion. He is not clothed with any authority to hear evidence or to determine its weight at the peril of the company, nor to occupy his time in such investigation. "There is but one rule which can safely be tolerated with any decent regard to the rights of railroad companies and passengers generally." "The company," says Denio, C. J., in the *Hibbard* case, "had a test far more convenient to all concerned than the taking of testimony, to-wit, the exhibition of their own ticket."

The trial judge also charged the jury: "If the conductor see, or know, or have information that he is feeble and paralyzed, or from other physical infirmities be unable to properly use his hands or body, and to make diligent search himself for his ticket, and request the officer to assist him in doing so, it is the duty of the officer to render such assistance as the passenger may request, and to render it properly and in good faith, and if he refuse and fail to do so, it would be negligence on his part; and if without making a careful examination, as the passenger requests, and using reasonable diligence in searching for the ticket, he expel the passenger, and it should turn out that he did in fact have a ticket which could have been proven with reasonable diligence, the expulsion would be unauthorized, and render the company responsible for the consequences of the act." In support of this charge we are referred to *Sheridan* v. *Brooklyn, etc., Railroad Company*, 36 N. Y., 39, where the plaintiff's intestate, a boy of nine years of age, was killed by the negligence of the conduc-

tor of a street railroad. In considering the proposition which the court was requested by the company to charge, " that the fact that the deceased was a child made no difference in the application of the rule of law as to the question. of negligence," the court said: "A sick or aged person, a delicate woman, a lame man, or a child, is entitled to more attention and care from a railroad company than one in good health and under no disability. They are entitled to more time in which to get on and off the cars; they are entitled to more consideration when crossing a street, to the end that the cars shall not run over them." But the eminent judge, afterwards Mr. Justice Hunt, of the Supreme Court of the United States, adds: "No one, whether sick, lame, imbecile or vigorous and youthful, is bound to exercise all the skill and all the care that the most capable and ready-witted person could command. Ordinary capacity and ordinary care and attention in protecting themselves is all that the law requires. This each is bound to give, whatever his age or condition; and if he fails, he cannot call upon others to supply his deficiencies or to compensate him for losses arising from its absence." We do not understand that it is the duty of a railroad conductor to render assistance to a passenger laboring under physical infirmities, or that the latter has the right to call upon him for such aid. On the contrary, the rule is that persons unable to take care of themselves must provide proper assistance: *New Orleans, etc., Railroad Company* v. *Statham,* 42 Miss., 607; *Willetts* v. *Buffalo Railroad Company,* 14 Barb.,

Railroad Company v. Fleming.

505. If, however, the conductor does, in accordance with the request of a disabled passenger, undertake to search for his ticket, he should do so properly and in good faith and with reasonable diligence, but only so far as the passenger himself asks. If the passenger limits his request to a search of one pocket which he designates, the conductor is not bound to search further. If the conductor, acting in good faith and with reasonable diligence, fail to find the ticket in the pocket indicated by the passenger, neither he nor the company can be held liable for the consequences of the failure. And if the conductor, the ticket being actually in the pocket designated, failed to find it merely because he did not exercise ordinary or reasonable diligence, neither he nor the company would be liable if the passenger were guilty of equal or greater negligence in the matter. If, for example, the passenger directed the conductor to the wrong pocket, or if the ticket was not actually in the pocket, or if the passenger, in the opinion of the jury, was guilty of equal or greater negligence in not making a more thorough search with the aid of his colored friends then present, there could be no recovery if the conductor acted in good faith. The case would, in that view, be one of those casualties the consequences of which could not be thrown upon a third party.

The law governing the recovery of damages is now well settled, the difficulty not being in its general principles, but in their application to particular facts. Actual compensation is the ordinary measure of dam-

ages, a departure from which is only made in excep-
tional cases: *Railroad Company* v. *Smith*, 6 Heis., 174..
If the wrong be done by a person acting under a
mistaken sense of duty, without any wrongful intent,
and without any violence or indignity to the aggrieved
party, it is a case for compensatory and not exem-
plary damages. Where the wrongful act is done from
a bad motive, or so recklessly as to imply a disre-
gard of social obligations, or where there is negligence
so gross as to be equivalent to positive misconduct,
exemplary damages may be awarded. The turpitude
of the defendant's conduct is also considered to jus--
tify the assessment of such damages, and there must
be a wrong intent on his part, or the wrongful exe-
cution of an honest intent. Where, therefore, a pas-
senger in a railroad train was wrongfully ejected by
the conductor at a regular station, for the non-payment
of the fare illegally demanded, the conductor acting
in good faith under the instructions of the company,
the act being done in a peaceable manner, without
violence, malicious intent or improper conduct, this
court held that the passenger would not be entitled
to recover exemplary damages, the company itself not
being fixed with any malicious intent in the instruc-
tions given, either to the particular passenger or pas-
sengers generally: *Railroad Company* v. *Guinan*, 11
Lea, 98. The law has been settled in the same way
by the Court of Appeals of New York, and it has
been held by that court that where a railroad con-
ductor, acting in what he believed to be the perform-
ance of duty to the company, removed a passenger

who refused to produce a ticket or to pay fare, although the removal was unlawful, the company was only liable to· compensatory damages. And it was said in the same case that a master is not liable in exemplary damages for the act of his servant, where the plaintiff would not have been ·entitled to recover such damages had the suit been against the servant: *Townsend* v. *Railroad Company*, 56 N. Y., 295. The converse of the latter ruling is not, however, equally true, for the employe of a company, as this court has held, may be liable in exemplary damages, while the company would only be bound for compensatory damages: *Railroad Co.* v. *Starnes*, 9 Heis., 52. And the weight of authority seems to be that the company is not to be punished by punitive damages for the mere negligence of the servant, if the company itself be entirely free from blame: *Cleghorn* v. *Railroad Company*, 56 N. Y., 44; *Illinois, etc., Railroad Company* v. *Hammer*, 72 Ill., 353. The company may be put in fault, and made liable for exemplary damages by fixing it with a malicious intent, or by showing that it has employed a drunken or otherwise incompetent servant, who inflicted the injury, or that its servant, in carrying on the company's business in the due course of his employment, intentionally did the wrong·act or performed a duty in such an improper manner as to show a reckless and wanton disregard of the rights of the aggrieved party. If, therefore, in the case before us, the conductor, after yielding to the request of the plaintiff to put his hand in a designated pocket, merely pretended to do so, or performed the

act in so grossly negligent a manner as to indicate a wanton and wicked purpose to disregard the rights of the passenger, or to wilfully inflict on him an injury, the company would be liable in exemplary damages, the negligence of the plaintiffs in that event going only in mitigating the damages. In any other event, if the company be liable at all, being itself free from fault, the damages would only be compensatory.

This brings us to the point upon which the charge of the trial judge was strongly against the company, and which no doubt largely influenced the verdict of the jury, and that is whether the alleged injuries claimed to have been sustained by the plaintiff by his night journey from Brentwood to Nashville, after his removal from the cars were the proximate result of such removal. Proximate damages, as this court has recently had occasion to say, are the ordinary and natural results of the particular negligence, and therefore such as might have been expected: *Jackson* v. *Nashville, Chattanooga & St. Louis Railway*, 13 Lea, 491. Whether damages are proximate or remote is a question for the jury, under proper instructions. And an important element in arriving at a correct conclusion is the conduct of the plaintiff subsequent to the wrong complained of, for it is his duty to see that as little injury follows the act as possible, and if by ordinary care a particular injury may be avoided, he cannot hold the wrongdoer responsible. Thus, where a railroad train failed to stop, as it should have done, at a particular station where the plaintiff was waiting to

go on board, and the plaintiff walked home, a distance of several miles, through the cold, whereby he incurred serious sickness, it was held that the act of walking home was as disconnected from the wrong of the company as would have been a loss by robbery: *Railroad Company* v. *Birney*, 71 Ill., 391. A company in giving its servants instructions to put off a passenger at a regular station, and the servant in executing his duty can scarcely be held liable for a personal injury to the passenger from his own voluntary act of walking home or to his destination, no matter how distant, or how inclement the weather may be, unless, indeed, the jury in view of all the circumstances should find that such a course was inevitable, or such as an ordinary prudent man would resort to, and as the employes of the company who were immediately instrumental in the wrongful act, from their knowledge of the circumstances, might reasonably have foreseen. The station at which the plaintiff was removed was the most important station between Franklin and Nashville, a small village with a depot building and thirty or forty houses, many of them occupied by persons of the plaintiff's race and color. The injury, if any, occasioned by the walk to Nashville would not be the proximate result of the removal from the cars at such a station, unless the plaintiff could show that he made reasonable efforts to avoid the walk and consequent exposure by applying for shelter or conveyance, and failed therein. And if the failure of such efforts was due to the negligence of the plaintiff in not having money with him

to pay for the accommodations asked for, it would be for the jury to say whether the walk was not the result of such negligence rather than the proximate consequence of removal from the cars.

Some objections were taken by the defendant to the admission of evidence, but as they were made without assigning any reason therefor, they are not sufficient to put the court below in error: *Miller* v. *State*, 12 Lea, 223.

Exception is also taken to the refusal of the trial court, the request of the defendant below, to require the jury to assess the compensatory and exemplary damages separately. In *Keith* v. *Clarke*, 4 Lea, 718, the converse of this position was insisted upon, and it was adjudged as error that the court permitted the jury to return separate findings of facts instead of a general verdict. These are matters entrusted to the discretion of the trial court.

The plaintiff is not precluded of his action by having accepted from the company the fare from Brentwood to Nashville on the morning after his ejection from the cars, and giving a receipt therefor. It does not appear that the transaction was either intended to be, or was in fact a settlement of the matters of litigation between the parties.

Judgment reversed, and cause remanded for a new trial.

WILSON, Sp. J., dissents, not from the conclusion reached in determining the case, but from several positions taken and others suggested *arguendo* as law in this case.